Slip Op. 10-123

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TRUMPF MEDICAL SYSTEMS, INC.<br><br>                    Plaintiff,<br><br>                         v.<br><br>UNITED STATES,<br><br>                    Defendant. | Before: Pogue, Judge<br>Court No. 07-00316 |

### OPINION AND ORDER

[Plaintiff's motion for summary judgment in tariff classification matter granted in part; defendant's cross motion denied.]

Dated: October 27, 2010

Simons & Wiskin (Philip Yale Simons and Jerry P. Wiskin) for the Plaintiff.

Tony West, Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, U.S. Department of Justice (Mikki Cottet) for the Defendants.

**Pogue, Judge:** This case concerns the proper tariff classification of certain surgical light systems imported into the United States by Trumpf Medical Systems, Inc. ("Trumpf" or "Plaintiff"). U.S. Customs and Border Protection ("Customs") liquidated Trumpf's merchandise as lamps or light fittings under various Subheadings of Heading 9405 of the Harmonized Tariff

Schedule of the United States ("HTSUS").[1]  Trumpf argues that its

merchandise is properly classified as surgical instruments or

appliances under HTSUS Heading 9018.[2]  Plaintiff and the United

---

[1] The government points to Subheading 9405.10.6020:

Lamps and lighting fittings including searchlights and
spotlights and parts thereof, not elsewhere specified or
included; illuminated signs, illuminated nameplates and the
like, having a permanently fixed light source, and parts
thereof not elsewhere specified or included:

> Chandeliers and other electric ceiling or wall lighting
> fittings, excluding those of a kind used for lighting
> public open spaces or thoroughfares:

> Of base metal:

> Other.[]

Items falling under this Subheading are charged an ad valorem
duty of 7.6 percent. Provisions like Heading 9405.10.6020 are
referred to as basket or residual provisions. <u>See</u> <u>E.M. Indus.,</u>
<u>Inc. v. United States</u>, 22 CIT 156, 165, 195 F.Supp.2d 1473, 1480
(1998). "'Classification of imported merchandise in a basket
provision, however, is appropriate only when there is no tariff
category that covers the merchandise more specifically.'" <u>Chevron</u>
<u>Chem. Co. v. United States</u>, 23 CIT 500, 506, 59 F.Supp. 2d 1361,
1368 (1999).

[2] Specifically, Plaintiff argues that its merchandise falls
under HTSUS Subheading 9018.90.60:

Instruments and appliances used in medical, surgical, dental
or veterinary sciences . . . parts and accessories thereof:

> Other instruments and appliances and parts and
> accessories thereof:

> Other:

> Electro-medical instruments and appliances
> and parts and accessories thereof:

> Electro-surgical instruments and

States ("Defendant" or the "Government") both move for summary judgment.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(a).

Because the common meaning of the terms of Heading 9018 does not support the government's narrow interpretation of the Heading's scope, the court grants, in part, the Plaintiff's motion.

## BACKGROUND

**I. Undisputed Facts**

Certain relevant facts are undisputed.

**A. Surgical Lights**

Plaintiff's undisputed evidence identifies six characteristics particular to surgical lights – High Illumination/Brightness, Color Rendition of Tissue, Light Field Diameter, Shadow Reduction, Limited Heat/Irradiance and Depth of Illumination – and a category of factors related to their purchase and sale.[3]

**B. Trumpf's Surgical Lights**

The parties also agree to certain background facts related to the surgical light systems that Trumpf imported into the United States.  Specifically, between November 2003 and July 2005 Trumpf

---

appliances, . . . ; all the foregoing
and parts and accessories thereof.

Items falling under this Subheading enter duty-free

[3] These characteristics and categories are further detailed in <u>Appendix A</u>.

imported its "Helion" and "Xenion" surgical light systems.[4] (Pl.'s Stmt. of Uncontested Material Facts ("Pl.'s Stmt.") ¶ 4(citing McArver Aff. ¶ 3).)[5]

These surgical light systems "consist of a surgical light and a ceiling mounted moveable arm to which the surgical light is attached." (Compl. ¶ 6.)  The movable arm allows "the surgeon to position the surgical lamp in the most favorable position during surgery."(Id.)

Among other various parts, the system includes:

- a surgical light or lights with a support boom and cardanic joint[6]  (Ex. C to McArver Aff.)

_____

[4] Trumpf uses different light bulbs to provide specific levels of illumination while limiting heat emission. Instead of using the traditional incandescent light bulb, the surgical light systems either use halogen gas -- the Helion model -- or xenon gas -- the Xenion model. (McArver Aff. ¶ 3.)  According to Trumpf, its Xenion lights have many advantages over halogen. Xenion lights "provide brighter illumination tha[n] halogen lights, are more cost efficient and tend to last longer[,]" (id.) and emit less heat. (Xenion Surgical Light User Manual ("Xenion"), Ex. B to McArver Aff., 13.)
"Halogen" is "[a]ny of a group of five chemically related nonmetallic elements including flourine, chlorine, bromine, iodine, and astatine." Webster's II New Riverside University Dictionary 560 (1988).  A halogen is "electronegative," that is, it has a "negative electric charge." Academic Press Dictionary of Science and Technology 728, 983 (1992). "Xenon" is "noble," that is, inert, gas. See id. 1471, 2384.

[5] The parties appear to agree that the following entries are composed of Trumpf's light systems: 233-3171894-2, 233-319579-6, 233-3317878-0, 233-3373454-1, 233-3366253-6, 233-3366242-9, 233-5540047-6, 233-5480395-1, 233-5480419-9.

[6] The court understands this to be a fixed point joint around which shafts/arms rotate.

- ceiling mounts (Ex. C to McArver Aff.; McArver Aff. ¶ 4)

- a central axis with (1) extension arms, (2) suspension arms, or (3) tracking arms (Ex. C to McArver Aff. <u>See also</u> McArver Aff. ¶ 5)[7]

- spring (or "sprung") arms (McArver Aff. ¶ 5; Helion Surgical Light User Manual ("Helion"), Ex. B to McArver Aff., 12; Xenion, Ex. B to McArver Aff., 12; Ex. C to McArver Aff.)

- transformer(s) (McArver Aff. ¶ 6)[8]

- a control panel (Helion, Ex. B to McArver Aff., 12; Xenion, Ex. B to McArver Aff., 12; McArver Aff. ¶ 5,) and

- for Helion lights, a switch box (McArver Aff. ¶ 9; Helion, Ex. B to McArver Aff., 12.)

Some of the systems also include accessories such as cameras, flat panel screens, and various electrical and electronic components.[9] (Compl. ¶ 6.) Trumpf imports the surgical light systems in an unassembled condition. (<u>Id.</u> ¶ 7; McArver Aff. ¶ 10.) However, the systems themselves are complete, that is, they need no additional parts in order to function. (Compl. ¶ 7; McArver Aff. ¶

---

[7] The number of extension or suspension arms depends upon the number of surgical lights and/or flat panel displays included in the system, as there is one suspension or extension arms per surgical light or flat panel display. (McArver Aff. ¶ 8.)

[8] The system requires one transformer per surgical light. (McArver Aff. ¶ 6.)

[9] Specific options available to customers include laser guided focusing, which "simplifies the precise positioning of the luminous field on very small areas" (Helion, Ex. B to McArver Aff., 15; Xenion, Ex. B to McArver Aff., 14,) fittings for MedTV camera systems (Helion, Ex. B to McArver Aff., 15; Xenion, Ex. B to McArver Aff., 15,) external brightness controllers (Helion, Ex. B to McArver Aff., 15,) and anti-drift systems. (<u>Id.</u>)

10.)  Indeed, the customer assembles the system

> by simply screwing the surgical lights to the suspension
> arms, screwing the suspension arms to the extension arms
> and attaching the unit to the ceiling of an operating
> room with a mounting bracket which is welded to the top
> of the central axis.

(Pl.'s Stmt. ¶ 8. See also McArver Aff. ¶ 10.)

Trumpf normally manufactures these systems in accordance with its customers' specifications.[10] (Pl.'s Stmt. ¶ 9; McArver Aff. ¶ 7.)  Moreover, Trumpf's surgical lights "are specially manufactured to have specific properties to provide the surgeon and the operating team with optimal illumination in an operating theater[,]" that is, "to provide a certain light intensity, low heat generation, control of shadows and depth of focus."[11] (Pl.'s Stmt. ¶ 15 (citing McArver Aff. ¶ 15; Moore Aff. ¶ 11; Stauffer Aff. ¶ 10; Grattan Aff. ¶ 10).) Regarding the trueness of light color, Trumpf claims to approximate "daylight on a bright day" by using a color temperature of 4300 K (Ex. A to McArver Aff. 5; Helion, Ex. B to McArver Aff., 27; Xenion, Ex. B to McArver Aff., 25,) and a CRI of 93. (Helion, Ex. B to

---

[10] Once the axis of the light is manufactured with the chosen number of arms to accommodate the requested number of lights, cameras, and flat panel displays, extra arms cannot be added, even at time of assembly. (McArver Aff. ¶¶ 7-8, 11.)  Moreover, arms wired for surgical lights cannot be used as arms for cameras or flat panel displays and vice versa. (McArver Aff. ¶ 8.) Therefore, if a customer cancels its order, Trumpf cannot easily resell its surgical lights. (McArver Aff. ¶ 12.)

[11] Customers can also select light type, size, control type (electronic or mechanical), camera and/or flat panel display, axis type, and arm types. (McArver Aff. ¶ 7.)

McArver Aff., 27; Xenion, Ex. B to McArver Aff., 25.)  Moreover,
users can adjust the luminous intensity, diameter of luminous field,
and position of luminous field. (Helion, Ex. B to McArver Aff., 18-
20; Xenion, Ex. B to McArver Aff., 17.)  Finally, the lights are
equipped with a sterile handle.[12] (Ex. A to McArver Aff. 5, 7;
Helion, Ex. B to McArver Aff., 24; Xenion, Ex. B to McArver Aff.,
18, 22-23.)

Trumpf sells its products only to hospitals and physicians and
only "for use in office surgical suites and clinics." (McArver Aff.
¶ 13. See also Grattan Aff. ¶ 4; Moore Aff. ¶ 3; Stauffer Aff. ¶ 3;
Burgess Aff. ¶ 3.)  Neither Trumpf nor its competitors sell their
lights to distributors or other sellers of home or commercial
lights.[13] (McArver Aff. ¶ 13.)  Purchasing agents with which

---

[12] This handle is detachable in order to allow for cleaning
and disinfection. (Helion, Ex. B to McArver Aff., 24; Xenion, Ex.
B to McArver Aff., 18, 22-23.)

[13] The "normal" or "standard" practice in the industry to
sell surgical lights is as follows. (Burgess Aff. ¶ 9; Grattan
Aff. ¶ 11; Moore Aff. ¶ 9.)  The sales consultant meets with the
hospital purchasing agent, the operating room business manager,
and the operating room manager. (Id. See also Grattan Aff. ¶¶ 10,
11; Moore Aff. ¶ 10; Stauffer Aff. ¶ 9.)  These hospital
personnel discuss with the surgeons the preferred surgical light
specifications. (Burgess Aff. ¶ 9. See also Grattan Aff. ¶ 11;
Moore Aff. ¶ 10; Stauffer Aff. ¶ 9.) After receiving reports from
hospital personnel as to these specifications, Trumpf installs in
the operating suite a demonstration surgical light and surgeons,
for two weeks, use the lights in actual surgical procedures.
(Burgess Aff. ¶ 9. See also Grattan Aff. ¶¶ 10, 11; Moore Aff. ¶
10; Stauffer Aff. ¶ 9.)  If the surgeons consider the light
satisfactory, the hospital personnel place an order with Trumpf
and Trumpf will install a completely new light system. (Burgess
Aff. ¶ 9. See also Grattan Aff. ¶¶ 10, 11; Moore Aff. ¶ 10;

Trumpf's sales staff interact "do not purchase lamps or lighting fittings which provide illumination in an office setting." (Grattan Aff. ¶ 9; Moore Aff. ¶ 8; Stauffer Aff. ¶ 8. <u>See also</u> Burgess Aff. ¶ 8.)  Trumpf and its competitors similarly do not describe their surgical lights as "lamps" or "lighting fittings." (Burgess Aff. ¶¶ 5, 6. <u>See also</u> Grattan Aff. ¶ 7; Moore Aff. ¶¶ 5, 6; Stauffer Aff. ¶ 6.)  Trumpf's competitors consist of other manufacturers and sellers of surgical light systems; Trumpf does not compete with manufacturers, sellers, or wholesalers "of lamps and lighting fittings used in a house or office building." (Burgess Aff. ¶ 6. <u>See also</u> Grattan Aff. ¶ 8; Moore Aff. ¶ 7; Stauffer Aff. ¶ 7.)

Trumpf has obtained approval for U.S. sale of its surgical light systems from the U.S. Food and Drug Administration ("FDA"), and Trumpf's surgical lights meet the requirements of the Medical Device Directive. (Burgess Aff. ¶ 4; Grattan Aff. ¶ 5; Moore Aff. ¶ 4; Stauffer Aff. ¶ 4. <u>See also</u> Helion, Ex. B to McArver Aff., 8; Xenion, Ex. B to McArver Aff., 8.)[14]

## II. Disputed Facts

Although both parties claim there are no material facts at issue, they present differing descriptions of the use of Trumpf's merchandise and of the composition of some specific entries at

_____

Stauffer Aff. ¶ 9.)

[14] It does not appear that traditional lamps used in homes or office settings require FDA approval. (Moore Aff. ¶ 4.)

issue.

## A. Use of Surgical Lights

Trumpf states that its surgical light systems "are used for intra-operative diagnostic purposes as well as providing proper illumination for a surgical procedure." (Blessing Aff. ¶ 4; Cobbs Aff. ¶ 4. See also Helion, Ex. B to McArver Aff., 8; Xenion, Ex. B to McArver Aff., 8 (The lights are "intended for local illumination of the part of the patient being examined or operated upon in a hospital or in a doctor's surgery.").) The subject lights "allow proper visualization intraoperatively of anatomic structures such as nerves, arteries, veins, intestines, and other glandular structures in order that vital structures are not unintentionally injured." (Blessing Aff. ¶ 4. See also Cobbs Aff. ¶ 4.)

The above-described use, Trumpf states, is the lights' only use. (Grattan Aff. ¶ 13 surgical light systems "are only used to illuminate a portion of a patient's body during surgery or for diagnostic purposes... I have never seen or heard of [] surgical light systems being used for another non-surgical related purpose"). Accord Stauffer Aff. ¶ 11.) Manuals for Helion and Xenion lights specifically state that the surgical lamps "may only be operated by surgeons, doctors or specially[-]trained personnel" and "[a]ny other use of the surgical light [besides the medical uses listed in the manual] is regarded as improper use." (Helion, Ex. B to McArver Aff., 8; Xenion, Ex. B to McArver Aff., 8.) Moreover, health

professionals consider Trumpf's surgical lights as "surgical appliance[s] or instrument[s]" and not as lamps or lighting fittings. (<u>See</u> Burgess Aff. ¶ 5; Grattan Aff. ¶ 6; Moore Aff. ¶ 5; Stauffer Aff. ¶ 5. <u>See also</u> Blessing Aff. ¶ 5 ("I consider a surgical light as a diagnostic instrument or appliance."). <u>Accord</u> Cobbs Aff. ¶ 5.) Trumpf insists that a "standard lamp or lighting fixture," such as those "used in an office setting or a house," are not used for illumination during a surgical procedure. (<u>See</u> Blessing Aff. ¶ 7; Cobbs Aff. ¶ 6.)

The government does not agree that Trumpf's lights are specifically designed for diagnostic purposes. <u>See</u> HQ967747 (Mar. 21, 2006). Instead, the government describes Trumpf's lights as specialized spotlights. See <u>id.</u> (citing HQ 967159 (Nov. 17, 2004)). The government presents evidence that a surgical lighthead from another company, STERIS Corp. ("STERIS"),[15] has been used in art

---

[15] STERIS manufactures surgical lights. Its lights are called Harmony Surgical Lighting and Visualization System ("HSLVS").

The government classifies STERIS's lights under HTSUS 9405. <u>See</u> HQ 967159 (Nov. 17, 2004). STERIS light include "1) a central axis, composed of carbon steel, that allows the lights and apparatus to move in circular motion around the patient to assist the surgeon during the surgical process. 2) the spring loaded arms, composed of carbon steel, that extend from the central axis and allow for either the lights or equipment to be mounted. 3) flat panel monitor adapters, composed of carbon steel, that connect with a spring load arm to mount a flat LCD monitor to the lighting system. 4) ceiling sets that allow for the lighting system to be mounted into the ceiling and consist of mounting components (nuts, bolts and clamp rings) to attach to the ceiling; a carbon steel suspension tube to which the lighting assembly is attached and which houses the system cables and

conservation laboratories. (<u>See</u> Rosenfeld Decl. ¶8 ("[T]he type of illumination provided by the STERIS lighthead is also desirable in the art conservation environment.").)  According to the government, the qualities of a STERIS lamp that provide illumination "that does not distort color and high intensity without heat, are also properties of lamps used in museum and art exhibition environments." (<u>Id.</u> at ¶9.)  "[T]he ability to increase and decrease the pattern size of illumination is a feature found in spotlights, including theater spotlights and display spotlights used in museum and retail stores." (<u>Id.</u> at ¶4).

Trumpf does not contest the qualities of a STERIS light or a spotlight, but asserts that these qualities are not necessarily those of a surgical light.  Trumpf does not offer specific evidence to this effect but nonetheless asserts that a STERIS light is not mentioned as a surgical light in the affidavit, essentially relying on the lack of the word "surgical light". (Pl.'s Resp. to Def.'s Additional Stmt. of Material Facts to which No Genuine Issue Exists ¶8.)  Trumpf also notes that their light systems are not comparable to STERIS lamp heads in that Trumpf's surgical light systems are only used in a surgical setting. <u>See</u> Pl.'s Resp. to Questions at 3.

**B.  Unassembled Surgical Light System**

Trumpf describes some of the entries at issue as parts of its

---

wires; and a plastic ceiling hood or cover. 5) lighting heads of carbon steel that provide the essential lighting function of the HSLVS." <u>Id.</u>

surgical light systems. These entries are listed in <u>Appendix B</u>.[16]

The parties agree that the imports in these entries <u>can</u> be used as part of surgical light systems.[17]  Moreover, there appears to be no dispute as to the actual contents of the entries.  However, the parties <u>do</u> dispute whether the entries were entered as "'complete,' 'unassembled'" surgical light systems or discrete items also entered for other potential uses.  The government argues that Trumpf has not presented evidence that the individual components are parts of surgical light systems, (<u>see</u> Def.'s Resp. to Pl.'s Stmt. of Material Fact Not in Dispute ¶4; Def.'s Additional Stmt. of Material Fact ¶3-4 (claiming certain entries are not in fact complete "surgical light systems.")), noting that neither the entry papers nor the commercial

---

[16] Trumpf has dropped its claims regarding Entry No. 233-3185814-4. (<u>See</u> Pl.'s Resp. to Def.'s Additional Stmt. of Material Fact as to which no Genuine Issue Exists ¶2.)

[17]Trumpf surgical light system components may include: ceiling mounts, an axis to attach suspension arms which rotates on a horizontal axis, the suspension arms, spring arms which move on a vertical axis and attach to the suspension arms, mounts for attaching a camera, mounts for attaching a flat panel monitor, a flat panel monitor(s). (<u>See</u> Ex. C to McArver Aff., 2.) These components in various configurations and including some or all of the aforementioned parts are for the purposes of litigation referred to as "pendants" by the parties.  Trumpf surgical light systems also may included: surgical lights with a support boom and a universal joint for rotating on both a horizontal and vertical axis. (<u>See</u> Ex. C to McArver Aff., 2.)  Depending on the configuration: transformers, a control panel, and switch boxes may also be necessary for the surgical light system.  (McArver Aff. ¶9.)  The actual surgical lights which are part of the system consist of the light source (incandescent quartz bulb containing xenon or halogen gas) and the housing.  (McArver Aff. ¶¶ 3, 6.)

invoices make reference to surgical light systems. (See Def's Mem. in Opp'n to Pl.'s Mot. for Summ. J and in Supp. of Def's Cross-mot. for Summ. J. 24. See also, e.g., Def.'s Resp. to Pl.'s Stmt. of Material Facts not in Dispute ¶4.)  Trumpf avers that the entries listed in Appendix A contained components of their surgical light systems.

## III. The Instant Litigation

Trumpf timely protested Customs' classification of the merchandise at issue, and Customs denied in part and granted in part these protests. See HQ 967747 (Mar. 21, 2006).  Having paid all liquidated duties, Trumpf subsequently commenced this action on August 28, 2007.

Customs liquidated the merchandise under two types of headings. See HQ 967747 (Mar. 21, 2006).  First, Customs liquidated certain of Trumpf's entries under HTSUS 9033.0033,[18] as parts and accessories of "ceiling mounted equipment platforms know as 'booms' or 'orbiters' which are intended to be used in hospital operating and recovery rooms, and intensive care environments." (Id.) However, after protest by Trumpf, Customs reconsidered and entered

---

[18] "Parts and accessories (not specified or included elsewhere in this chapter ) for machines, appliances, instruments or apparatus of chapter 90."

these items under HTSUS 9402.90.00.20 as "medical furniture."[19]

(Id.)  Articles imported under Heading 9402.90.00.20 are duty free

and, as a result, Trumpf does not contest this classification.

Second, HQ 967747 classified the surgical lamps under heading

9405.10.6020 as opposed to Heading 9018.90.60.  In making this

determination, Customs relied heavily on an earlier ruling, HQ

967159, which addressed the classification of HSLVS lights, like the

STERIS lights, i.e., "overhead light used in surgical suites by

surgeons." HQ 967159 (Nov. 17, 2004).  Using identical language as

in HQ 967159, Customs in HQ 9967747 determined that the lights in

contention here were better classified under 9405 rather than 9018.

Customs stated that:

> Lamps which 'are specially designed for diagnostic,
> probing irradiation etc. purposes' are included in
> Heading 9018, HTSUS.  However the instant HSLVS parts can
> not be said to have been designed for a lamp used in
> probing or irradiation.  Lamps so designed are those that
> are part of an instrument which probes the body, such as
> an endoscope, which enables the clinician to see the
> internal organ and take a cell sample so as to diagnose
> a disease.  Lamps used for irradiation are those which
> employ radiation to reveal, most commonly, skin diseases.

See HQ 967747.

Before Customs, Trumpf argued that its lights are used for

diagnostic purposes, namely that these lights have "certain

_____

[19]These items were ceiling mounted booms and orbiters which
move on gas or electric power.  The booms are set up to hold
shelving and receptacles "designed to accept and hold monitoring
devices." See HQ 967747 (Mar. 21, 2006).

temperature and lighting features which will not harm the patient during a surgical procedure . . . [and] attachment of visualization equipment during certain surgical procedures and a handle to position it during surgery." Id.;(see also Blessing Aff. ¶4.)  The government did not find Trumpf's argument persuasive, stating:

> Precision overhead room lighting is necessary for the surgeon to do his or her job.  But the instant merchandise is not used in direct contact or even in close proximity with the patient for the sole benefit of diagnosis of disease.  While it is specialized lighting to be sure, it is more akin to the explicitly excluded spotlight of heading 9405, HTSUS, than it is to the included lamps attached to endoscopes and the like, that are used in intimate contact with the patient.

HQ 967747.  In response to Customs' ruling, Trumpf brought the instant action, contending that the surgical lights described are better classified to under HTSUS 9018 rather than 9405.

## STANDARD OF REVIEW

The court's review of Customs classification is twofold.  "The proper scope and meaning of a tariff classification term is a question of law[,]... determining whether the goods at issue fall within a particular tariff term as properly construed is a question of fact." Franklin v. United States, 289 F.3d 753, 757 (Fed. Cir. 2002)(citations omitted).

In classification cases, genuine issues of material fact only arise when there is a dispute over the use, characteristics, or properties of the merchandise being classified, see Brother Int'l

Corp. v. United States, 26 CIT 867, 869, 248 F.Supp.2d 1224, 1226 (2002), or where commercial meaning is in question. See Russell Stadelman & Co. v. United States, 242 F.3d 1044, 1048 (Fed. Cir. 2001). This follows from the familiar summary judgment standard: summary judgment is appropriate "if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgement as a matter of law." USCIT R. 56(c) (emphasis added).  Material issues only arise concerning "facts that might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On questions of law, a customs' classification is subject to de novo review as to the meaning of the tariff provision, pursuant to 28 U.S.C. § 2640, but may be accorded a "respect proportional to its 'power to persuade.'" United States v. Mead Corp., 533 U.S. 218, 220 (2001) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

In interpreting and applying the HTSUS, the court looks to the General Rules of Interpretation ("GRI"), as well as the Additional United States Rules of Interpretation ("ARI"). See Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed Cir. 1998); Faus Group Inc. V. United States, 28 CIT 1879, 358 F.Supp 2d. 1244, 1250 (2004). GRI (1) states that

> [F]or legal purposes, classification shall be determined
> according to the terms of the headings and any relative

section or chapter notes and, provided such headings or notes do not otherwise require, according to the following provisions.

GRI (1) is "intended to make it quite clear that the terms of the headings and any relative Section or Chapter Notes are paramount, i.e., they are the first consideration in determining classification." 1 World Customs Org., Harmonized Commodity Description & Coding Sys., Explanatory Notes 1 (3 ed. 2002) ("Explanatory Notes").[20] Thus, interpretation of tariff headings, and the court's analysis, originate in the language of the Headings, Subheadings, Section Notes and Chapter Notes of the relevant parts of the HTSUS, in this case, Chapters 90, and 94.[21]

## ANALYSIS

As noted above, the government contends that the Trumpf lighting systems are to be classified under Heading 9405. ("Lamps

---

[20] The Explanatory Notes are not "controlling legislative history but nonetheless are intended to clarify the scope of [the] HTSUS [] and to offer guidance" in the court's interpretation. Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994).

[21] Relevant to the entries in Appendix A, GRI (2) states that an article may be entered in an unfinished state and still fall under a particular heading. However, that article must have the same "essential character" as the finished article. GRI (3) Explanatory Note VIII provides: "The factor which determines essential character will vary as between different kinds of goods. It may, for example, be determined by the nature of the material or component, its bulk, quantity, weight or value, or by the role of a constituent material in relation to the use of the goods."

and lighting fittings including searchlights and spotlights and
parts thereof, not elsewhere specified or included."). But the
Explanatory Notes to chapter 94, subpart (II)(l) specifically
exclude from Heading 9405 "[m]edical diagnostic, probing,
irradiation, etc., lamps (Heading 90.18)." Id. 9405 (II)(l). Thus,
if Trumpf's merchandise is properly classified under Heading 9018,
it cannot be classified under Heading 9405.   Therefore, the court
will first consider the language of Heading 9018, and the Chapter
Notes thereto, to determine their application here.[22]


I. HTSUS Heading 9018[23] [24]

    A. Merchandise Included in Heading 9018[25]

---

[22] The court notes that Heading 9018 is a "use" provision.
See ARI 1(" In the absence of special language or context which
otherwise requires--
(a) a tariff classification controlled by use (other than actual
use) is to be determined in accordance with the use in the United
States at, or immediately prior to, the date of importation, of
goods of that class or kind to which the imported goods belong,
and the controlling use is the principal use . . .")

[23] Heading 9018 falls under Chapter 90: "optical,
photographic, cinematographic, measuring, checking, precision,
medical or surgical instruments and apparatus; parts and
accessories thereof."

[24] The court notes that the language of the HTSUS for all
relevant years remains unchanged.

[25] Merchandise under Chapter 90 also includes "parts and
accessories" of such "instruments and apparatus"; Chapter Note 2
instructs that "parts and accessories for machines, apparatus,
instruments or articles of [Chapter 90] are to be classified
according to the following rules":
    (a) Parts and accessories which are goods included in any of

### 1. "Appliance" or "instrument"

The Chapter Notes to Heading 9018 do not define "appliance" or "instrument," though dictionaries use these terms somewhat interchangeably.  These dictionary definitions indicate that an "appliance" constitutes a "device,[26] apparatus[27], or instrument

---

the headings of [Chapter 90] or of [C]hapter 84[] [or] 85 (other than headings 8485, 8548 or 9033) are in all cases to be classified in their respective headings;

(b) Other parts and accessories, if suitable for use solely or principally with a particular kind of machine, instrument or apparatus, or with a number of machines, instruments or apparatus of the same heading (including a machine, instrument or apparatus of heading 9010, 9103 or 9103) are to be classified with the machines, instruments or apparatus of that kind;

(c) All other parts and accessories are to be classified in heading 9033.

Moreover, components of a machine that work together to perform a certain function are classified in the heading appropriate to that function. <u>See</u> Chapter Note 3 (Incorporating by reference Section XVI Note 4 ("Where a machine (including a combination of machines) consists of individual components (whether separate or interconnected by . . . by electric cables or by other devices) intended to contribute together to a clearly defined function covered by one of the headings in [Chapter 90], then the whole falls to be classified in the heading appropriate to that function.")). <u>See also</u> Explanatory Notes Heading 9018 ("Subject to the provisions of Notes 1 and 2 to [Chapter 90], parts and accessories of apparatus or appliances of this heading remain classified here.").

[26] A "device" is "[s]omething constructed or devised for a particular purpose, [especially] a machine used to perform one or more relatively simple tasks." <u>Webster's II New Riverside University Dictionary</u> 370 (1988).
A "machine" is "a device or system along with its source of power and auxiliary equipment" or, more broadly, "[a] system, [usually] of rigid bodies, constructed and connected to change, transmit, and direct applied forces in a predetermined way to

for performing or facilitating the performance of a particular function." <u>Dorland's Illustrated Medical Dictionary</u> 116 (27th ed. 1988). <u>See also</u> 1 <u>Oxford English Dictionary</u> 575 ("[A] thing applied as a means to an end" or an "apparatus"); <u>Academic Press Dictionary of Science and Techonology</u> 140 ("[I]n general, any tool or machine that is used to carry out a specific task or produce a desired result."). Similarly, an "instrument" is "any tool, appliance, or apparatus." <u>Dorland's Illustrated Medical Dictionary</u> 842. <u>See also</u> 7 <u>Oxford English Dictionary</u> 1050 ("a tool[] or implement"[28]); <u>Webster's Third New International Dictionary</u> 1172 (2002) (A "utensil"[29] or a surgical "implement"); <u>Academic Press Dictionary of Science and Technology</u> 1117 ("[A] mechanical tool or device, especially one designed for precise operations"); <u>Webster's II New Riverside University Dictionary</u> 633 ("A means by which something is accomplished"). These definitions are broad in nature. An

─────────────────────────

accomplish a particular objective, as performance of useful work." <u>Id.</u> 712. <u>See also</u>  <u>Academic Press Dictionary of Science and Technology</u> 1289 (a machine is "any device that transmits or modifies energy...[or is] an assembly of interrelated parts, each with a definite motion and separate function; used to perform a specific task.")

[27] An "apparatus" is a "machine" or "group of machines used together or in succession to accomplish a task." <u>Webster's II New Riverside University Dictionary</u> 118.

[28] The term "implement" includes "tool[s], utensil[s], or instrument[s] for doing a task." <u>Webster's II New Riverside University Dictionary</u> 614.

[29] A "utensil" is "[a]ny useful tool . . . ." <u>Webster's II New Riverside University Dictionary</u> 1272.

appliance, device or machine, need only accomplish one "simple task" or serve a "particular function" in providing "useful work."[30]

Trumpf's light systems qualify under the broad common meaning of these terms because the light systems perform a specific task.

**2. Professional Use**

The Explanatory Notes instruct that Heading 9018 covers a "wide range of instruments and appliances <u>which in [the] vast majority of cases are used only in professional practice</u>." Explanatory Notes 9018 (emphasis added).  For example, the Heading includes articles used by doctors, surgeons, and dentists "either to make a diagnosis, to prevent or treat an illness or to operate." <u>Id.</u>[31]  As stated above, Trumpf claims that its surgical light systems have but "one commercial use and that is assisting surgeons during an operation in an operating theater." (Compl. ¶ 8).

Arguing to the contrary, the government states that STERIS lightheads, though another brand of surgical lightheads, are used in art conservatories.  Through the affidavit of a lighting designer, the government claims that the use of a STERIS lighthead

_____

[30] Further, in our case law, "there is no 'judicial determination' of what a machine is. It remains simply a question of common meaning . . . ." <u>Victoria Distributors, Inc. v. United States</u> 56 Cust.Ct. 284, 288, 1966 WL 9504 (1966).

[31] Heading 9018 will also cover a number of medical tools, such as "hammers, mallets, saws . . . or articles of cutlery (scissors, knives, shears etc.) . . . only when they are clearly identifiable as being for medical or surgical." <u>Id.</u>

in an art conservatory confirms that these types of light systems are used in forums outside of the medical industry.  See Rosenfeld Decl.

To the court, however, even assuming that a lighthead similar to Trumpf's has another potential use, the Explanatory Notes for Heading 9018 provide some flexibility.  The phrase "in the vast majority of cases" indicates an understanding that a single example of an appliance used outside of the medical profession does not preclude coverage under this heading.

While the parties do not agree that Trumpf's surgical light systems are used solely for medical and surgical purposes, all of the evidence submitted indicates that the light systems' design is still "clearly identifiable" as for medical use; moreover, there is no dispute that these lights are commonly seen only in the medical setting.  See Pl.'s Resp. To Questions Exhibit A.  Accordingly, the court cannot conclude that the government has raised a material issue of fact on the issue of professional use.

### 3. "Diagnostic"

Of particular significance here, the Explanatory Notes state that Heading 9018 includes "[l]amps which are specially designed for diagnostic, probing, irradiation etc. purposes." Id. (I)(R) (emphasis added).[32]  The parties dispute the meaning of the term

_____

[32] Torches such as those in the shape of a pen are **excluded** (heading 85.13) as are other lamps which are not clearly identifiable as being for medical or surgical use (heading

"diagnostic," and whether the illumination[33] that Trumpf's surgical light systems provide constitutes a "diagnostic purpose."

Unsurprisingly, "diagnostic" denotes "relating to or based on a diagnosis." Academic Press Dictionary of Science and Technology 625. "Diagnosis" specifically means "the identification of a disease or condition on the basis of its signs and symptoms." Id. In medical terms, "diagnostic" "pertain[s] to or subserv[es] diagnosis; [or is] distinctive of or serving as a criterion of a disease, as signs and symptoms." Dorland's Illustrated Medical Dictionary 461. Thus, a light system that is configured in such a way as to assist a health professional to detect the "signs and symptoms" of a condition or disease has a diagnostic use.

In its classification ruling, Customs stated that because Trumpf's surgical lights do not come in "direct contact...or [] close proximity with the patient for the sole benefit of diagnosis of disease" HQ 967747 (Mar. 21, 2006), they cannot be defined as a diagnostic tool. Trumpf claims that this idea of proximity is not necessary to assist a physician in diagnosis. In addition, Trumpf claims that the lights are within "several feet" of the patient

---

94.05). Id. (I)(R)

[33] Both parties agree that Trump's surgical lights provide illumination (See Def.'s Resp. to Pl.'s Stmt. of Material Facts not in Dispute ¶10; Def.'s Resp. to Questions at 4; Pl.'s Mem. at 10; Cobbs ¶ 4; Blessing ¶ 4; 21 C.F.R. § 878.4580 (citing the Food and Drug Administration ("FDA")).

during operations and are thus in close proximity to the patient. Trumpf further claims that surgery is often required for diagnosis, and that the surgical lights assist in examination, probing and observation of a patient.  (Pl.'s Mem. At 22-23).

The notion of spacial proximity is not included in the definition of "diagnostic," the meaning of which turns upon the role the instrument plays in assisting a physician to identify and determine diseases and conditions.  Surgical lighting is, of course, not the only factor in diagnosis.  When a variety of diagnostic tools are required, lighting may not even be the main tool used in a diagnosis.  However, a surgical light does assist in diagnosis by providing proper and specific illumination, without which operations and exploration into a patient's condition would be extremely difficult.

Rules of statutory interpretation support this view. Specifically, under the rule of *noscitur a sociis*, if the language of a statute is ambiguous, "the meaning of an unclear word or phrase should be determined by the words immediately surrounding it." Black's Law Dictionary (9th ed. 2009) 1160-61; See also X-Acto Crescent Products Co., Inc. v. United States 27 Cust. Ct. 190, 190-191, Not Reported in F.Supp., WL 6228 (1951).  Therefore, the meanings of the words "probing" and "irradiation" should shed light upon the meaning of "diagnostic," and provide clues about what may be included in the "etc." in this list.

"Probing" is "exploring or searching with the aid of a probe." Webster's II New Riverside University Dictionary 937; medically, a probe is a "slender, flexible instrument designed for introduction into a wound, cavity or sinus tract for purposes of exploration." Dorland's Illustrated Medical Dictionary 1355.   Further, to "irradiate" is "[t]o send forth in a way analogous to the emission of light." Webster's II New Riverside University Dictionary 644. In medical terms, "irradiation" is "treatment by photons, electrons, neutrons, or other ionizing radiations...the application of rays, such as ultraviolet rays, to a substance to increase its vitamin efficiency" Dorland's Illustrated Medical Dictionary 856.

It follows that the act of irradiation is similar to illumination in that, in both cases, rays are emitted.  Even though irradiation provides treatment for a patient, proper illumination assists a doctor to explore a field (similar to a probe), in order to diagnose a disease or condition. Thus, in context, the term diagnostic is broad enough to include Trumpf's surgical lighting systems.

Because the Defendant presents no evidence to dispute Trumpf's evidence that its surgical light's "chief use" is "as an aid to physicians in identifying a disease or illness from its signs and symptoms" Instrumentation Associates, Inc. v. United States 58 Cust.Ct. 471, 479, 269 F.Supp. 777, 783 (Cust.Ct. 1967), the light systems can be considered a diagnostic tool.

### CONCLUSION

For the foregoing reasons, the court concludes that Plaintiff's entries of complete surgical light systems are correctly classified under HTSUS 9018.90.60 and not under Heading 9405.10.6020, as classified by Customs. The parties are directed to review the descriptions and components of the entries identified in Appendix B and to determine how these entries should be classified consistent with this Opinion.  A draft judgment shall be submitted by November 29, 2010, provided that if the parties cannot agree to the terms of said judgment, they shall submit statements of their positions with regard to all of the entries at issue.

It is **SO ORDERED**

                                         /s/ Donald C. Pogue
                                        Donald C. Pogue, Judge
Dated: October 27, 2010
       New York, New York

## APPENDIX A

Characteristics of surgical light systems:

### 1. High Illumination/Brightness

Illumination is "the act of adding light to a surface" (Ex. B to Pl.'s Mot. Summ. J. 6) and is measured, internationally, in "lux."[34]  (Id.)  Industry standards[35] dictate that surgical lights should produce a minimum illuminance of 100,000 lux or 100 klux. (Ex. A to Pl.'s Mot. Summ. J. 2. Accord Ex. B to Pl.'s Mot. Summ. J. 6.)  Peak central illuminance should not exceed 160 klux, as this light level will cause glare and increase irradiation. (Ex. A to Pl.'s Mot. Summ. J. 8. Accord Ex. B to Pl.'s Mot. Summ. J. 12.) Illumination from a surgical light must be consistent (Ex. B to Pl.'s Mot. Summ. J. 10,) intense, and uniform. (Ex. A to Pl.'s Mot. Summ. J. 2.)

### 2. Color Rendition of Tissue

A surgical light must carefully calibrate the color of the emitted light such that surgeons are able to view, in true color, tissue, organs, and skin.  The emitted light must be as close to

---

[34] One lux is "equal to the illumination of a surface all of which is one metre from a uniform point source of light of unit intensity . . . ." 9 Oxford English Dictionary (2nd 1989) 127.

[35] Industry standards come from Illuminating Engineering Society and the International Electrotechnical Commission. (Ex. B to Pl.'s Mot. Summ. J. 11-12.)  The U.S. Food and Drug Administration ("FDA") mandates that companies must follow either of these guidelines. (Id. 11.)

white as possible, mimicking that of noon sunlight. (Ex. B to Pl.'s Mot. Summ. J. 7. See also Ex. A to Pl.'s Mot. Summ. J. 2.) One way of ensuring faithful color is to manipulate color temperature.[36] Color temperature is measured in degrees of Kelvin. (Ex. B to Pl.'s Mot. Summ. J. 7.)  According to industry standards, color temperature should range from 3500 to 6700 Kelvin; surgeons prefer a color temperature of approximately 4500 Kelvin. (Id.)

Another measure of true color uses the Color Rendering Index ("CRI"). (Ex. A to Pl.'s Mot. Summ. J. 7.)  The CRI "measures the effect of the light on the color appearance of the objects being seen." (Ex. B to Pl.'s Mot. Summ. J. 9.)  CRI values anywhere from 85% to 100% are acceptable. (Ex. A to Pl.'s Mot. Summ. J. 7.)  A surgical light rating of 94% is considered "good." (Ex. B to Pl.'s Mot. Summ. J. 9.)  As a comparison, florescent lights have a CRI of around 70%. (Ex. A to Pl.'s Mot. Summ. J. 7.)

### 3. Light Field Diameter

The light pattern[37] diameter of the light field is also

---

[36] If the color temperature is too low, emitted light appears pink or red, whereas if the color temperature is too high, emitted light appears blue. (Ex. A to Pl.'s Mot. Summ. J. 2; Ex. B to Pl.'s Mot. Summ. J. 7.)  The surgical light color temperature should fall between these two hues. (Ex. A to Pl.'s Mot. Summ. J. 2; Ex. B to Pl.'s Mot. Summ. J. 7.)

[37] The light pattern is "an area in which the level of illumination tapers from the center to the periphery so that illumination at the edge is no less than 20% of that at the center." (Ex. B to Pl.'s Mot. Summ. J. 13.)

important; if the diameter is too large, glare can be a problem,
but, if a surgeon needs diffuse light, a small diameter can also
pose problems. (Id. 3.)  The light field must be large enough to
illuminate the particular surgery involved. (See id. 7.)  Given the
diversity of types of surgeries, surgical lights should allow for
adjustment of the light pattern size. (Id. 3.)  In any event,
industry standards dictate that the light pattern diameter should
not be smaller than eight inches. (Ex. B to Pl.'s Mot. Summ. J. 13.)

### 4. Shadow Reduction

In order to ensure optimal illumination of the surgical site,
the light must minimize contrast shadows.[38] (Ex. A to Pl.'s Mot.
Summ. J. 2.)  The light, therefore, must have the ability to beam
light around obstacles located between the light and the wound. (Ex.
B to Pl.'s Mot. Summ. J. 9.)  The light's design can involve
lighthead diameter,[39] the number of lighthead lamps, the type of
lens, or the type of refraction system. (Id.)

### 5. Limited Heat/Irradiance

While providing for optimal lighting, a surgical light must

---

[38] Contrast shadows "result from obstructions cast by hands
or instruments" whereas contour shadows "help the surgeon
differentiate between fine tissue striations and vasculature."
(Ex. A to Pl.'s Mot. Summ. J. 2.)  Thus, a good surgical light
must limit contrast shadows but maintain contour shadows. (Id.)

[39] The larger the lighthead diameter, the better the shadow
control.

nonetheless limit its radiated energy, or its irradiance. (Id. 8; Ex. A to Pl.'s Mot. Summ. J. 7.)  This is because heat will both dessicate tissue and make the surgical team uncomfortable. (Ex. A to Pl.'s Mot. Summ. J. 2-3.) Unfortunately, irradiance increases with increased illumination. (See Ex. B to Pl.'s Mot. Summ. J. 8.) For this reason, many surgical lights attempt to limit heat emission by using light filters, lenses, reflectors, reflector coatings, and sealed light designs (id. 11,) and/or by designing the light in such a way that it releases the heat behind the lighthead, (id. 8-9.)

### 6. Depth of Illumination[40]

A surgical light must provide sufficient depth of field, that is, sufficient range of illumination in order to reach tissue on surgery tables located a certain distance away from the light. (Ex. A to Pl.'s Mot. Summ. J. 8. See also Ex. B to Pl.'s Mot. Summ. J. 9 ("depth of field . . . indicates the length of the range within the focused, usable light that is projected").)  Depth of field is measured as "the depth below the one-metre level reference point at which the central illumination falls to 20% of its initial value." (Ex. A to Pl.'s Mot. Summ. J. 8.)  Ideally, the light should be positioned such that the surgical site is within the light's focal length, that is, positioned so that "the area where the [light]

---

[40] In the literature before the court regarding surgical lights, depth of illumination is sometimes also referred to as depth of field, focal length, or depth of focus. (Ex. B to Pl.'s Mot. Summ. J. 9; McArver Aff. ¶ 15.)

pattern is at its brightest and most focused" shines on the surgical cavity. (Ex. B to Pl.'s Mot. Summ. J. 9.)

### 7. Other Factors

Other factors hospitals consider when purchasing surgical lamps include: abilities to "transfer video signal and power to multiple flat panel monitors," "incorporate video camera systems," and "integrate into endoscopic automation systems"; conventional illumination of the operating room; "flexibility" and "maneuverability"; stability -- that is, the light will not drift away; sterile control; and ease of cleaning. (Id. 9-10.)

### APPENDIX B

#### 1. Entry No. 233-3416935-8

Trumpf describes this entry as containing "70 examination lights, Helion ® S light[s] specially configured to mount on TRUMPF's critical care nursing booms." (McArver Aff. Dated June 2, 2010 ¶3.)[41] Trumpf further contends that these are "examination lights" used for "medical diagnostic uses." Pl.'s Resp. to Questions at 4). Defendant contests that these lights are imported for use with the booms, not the surgical light systems, and that Plaintiff should not now be able to bring an action for lights not part of the surgical light systems at issue.  Def.'s Resp. to Questions at 7.

#### 2. Entry No. 233-3302102-2

Trumpf's evidence states that "Entry [No.] []233-3302102-2 contain[ed] seven flat panel display mounts on separate pendants." (McAver Aff. Dated June 2, 2010 ¶3-f.)  The commercial invoice number for this entry provides an identical description. (Id. ¶2-3 (Invoice, Ex. F to McArver Aff. Dated June 2, 2010, 28.))[42] The

---

[41]   The government asserts that this entry simply included light bulbs. (See Def.'s Resp. to Pl.'s Stmt. of Material Facts not in Dispute ¶4.)

[42]   See also McAver Aff. Dated June 2, 2010 ¶2 ("There are no price lists which identify the components contained in each of TRUMPF's surgical light products contained in these entries.").) The court interprets Trumpf to claim that all products mentioned in the affidavit are part of surgical light systems and therefore

government asserts that this entry simply contained pendants and
flat panel mounts. (Def.'s Resp. to Pl.'s Stmt. of Material Facts
not in Dispute ¶4.) According to the government, "pendants" are
suspension systems which are suspended from the ceiling with display
monitors and no lights[.]" (See id.)

### 3. Entry No. 233-3257991-3

Trumpf describes the contents of Entry No. 233-3257991-3 as; "three
flat panel display mounts on separate pendants" or three systems of
Helion® L+/L lights with flat panel mounts. (McArver Aff. Dated June
2, 2010 ¶3-d.)  The government argues that these entries simply
contained pendants with flat panel display mounts and "several
numerous articles not identified as being components of complete
unassembled surgical lights." (Def's Resp. to Pl's Stmt. of Material
Facts not in Dispute ¶4.)[43]

### 4. Entry No. 233-5554827-4

The government asserts that Entry No. 233-5554827-4 contained flat
panel mounts with separate pendant systems that are suspended from
the ceiling, with neither lights nor display monitors. (Def's Resp.
to Pl's Stmt. of Material Facts not in Dispute ¶4.)  The government
claims that these articles are not part of Trumpf's surgical

_____

do not have their own price lists as separate parts.

[43] The invoices also appear to suggest a difference in size
and a difference between flat panel display mounts and flat panel
displays.

lighting system. (Def's Resp. to Questions at 7). Trumpf states that this entry contains "six surgical light systems and six flat panel display mounts on separate pendants" (Pl.'s Resp. to Questions at 4), as well as "six flat panel mounts on separate pendants." (<u>Id.</u> at 5.) The entry also includes eighteen transformers for use with Xenion® L/L lights.

### 5. Entry No. 233-3302107-1

Plaintiff claims that Entry No. 233-3302-107-1 contained two Helion® systems and two flat panel display mounts. (McArver Aff. Dated June 2, 2010 ¶3-e.)  According to Trumpf, the systems consisted of pendants and surgical lights in two configurations. (<u>Id.</u>)  One configuration is a Helion® L+ "with a flat panel display and including the transformer boxes and control units." (<u>Id.</u>) The other is a "Helion®  M+ light system with a flat panel display and including the transformer boxes and control units." (<u>Id.</u>)  The entry also included "two flat panel display mounts on separate pendants." (<u>Id.</u>)

### 6. Entry No. 233-3247748-0

Plaintiffs cite invoices indicating that this entry contained "12 individual systems with Xenion® L/L lights, handles, identified as 'side rails,' wall controls and transformers." (<u>Id.</u>  ¶3-g.)  The pendants and the surgical lights were also included. (<u>Id.</u>)  "In addition, this entry also contain[ed] 12 flat panel display mounts

on separate pendants, which are identified on the commercial invoice." (<u>Id.</u>)

### 7. Entry No. 233-3317874-9

Entry No. 233-3317874-9 "contain[ed] eight systems with Helion® L+ lights, their transformers and controls." (<u>Id.</u> at ¶3-h.) The systems included the pendants and the lights. (<u>Id.</u>) The entry, moreover, "contain[ed] eight flat panel display mounts on separate pendants." (<u>Id.</u>) The government claims that this entry contained no lights (Def's Resp. to Questions at 7). Trumpf contends "that these components constitute surgical light systems." (Pl.'s Resp. to Questions at 6).

### 8. Entry No. 233-5510440-9

Trumpf asserts that Entry No. 233-5510440-9 consisted of pendants, surgical lights, and a "flat panel mount on a separate pendant." (McArver Aff Dated June 2, 2010 ¶3-c.) Specifically, the imported systems in this entry contained "two Xenion lights: Xenion® L/ Xenion® M+." (<u>Id.</u>) This entry also included transformers used with the Xenion® L/ Xenion® M+ light systems. (<u>Id.</u>) The government again contends that this entry "contain[ed] several [] articles not identified as being the components of the complete unassembled surgical lights system contained in the entry." (Def's Resp. to Pl.'s Statement of Material Fact Not in Dispute ¶4.)